THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 25 CR 575 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| TRAYVON GILFORD | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

Trayvon Gilford, a convicted felon, is charged with possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Gilford moves to dismiss this count of the Indictment, arguing that the charge violates the Second Amendment. For the following reasons, the Court denies Gilford's Motion to Dismiss [19].

## BACKGROUND

On or around October 25, 2023, law enforcement officers recovered a firearm and extended magazine from Gilford's car after stopping and seizing the vehicle based on suspicion that it was involved in a recent armed robbery. (Dkt. 21 at 2). At the time of Gilford's arrest, Gilford had three prior Illinois felony convictions: a September 2019 conviction for aggravated unlawful use of a weapon and August 2023 convictions for the manufacture/delivery of fentanyl and escape from electronic monitoring. (Dkts. 21-1, 21-2, 21-3); *see also* 720 ILCS 5/24-1.16(A)(1); 720 ILCS 570/401(c)(1.5); 730 ILCS 5/5-8A-4.1(A). Gilford was on probation for his August 2023 convictions when he was arrested in the present case. (Dkt. 21 at 2).

1

On September 16, 2025, a grand jury indicted Gilford with one count of possession of a machine gun in violation of 18 U.S.C. § 922(o) (Count I) and one count of possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count II). (Dkt. 1). Gilford now moves to dismiss Count II of the Indictment on Second Amendment grounds, challenging § 922(g)(1) facially and as applied to him. (Dkt. 19).

## LEGAL STANDARD

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), such as a constitutional violation. *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996). When considering a motion to dismiss a criminal indictment, the Court assumes all facts are true and views them in the light most favorable to the government. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

## DISCUSSION

Gilford claims that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him. (Dkt. 19). First, the Court will briefly summarize Second Amendment jurisprudence, including the appropriate standard for evaluating constitutional challenges. Then, the Court will evaluate the merits of Gilford's claims.

### I. Second Amendment Jurisprudence

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment enshrines "the individual right to possess and carry weapons." 554 U.S. 570, 592

2

(2008). At the same time, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. In particular, the Court explained that "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. These laws enjoy a presumption of constitutionality. *Id.* at 627 n.26. Two years later, in *McDonald v. City of Chicago*, the Court incorporated the Second Amendment right against the states, repeating the "assurances" from *Heller* that the Court was not doubting "longstanding regulatory measures" like the prohibition on the possession of firearms by felons. 561 U.S. 742, 786 (2010) (citing *Heller*, 554 U.S. at 626-627).

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court established the new test for assessing the constitutionality of firearm regulations, holding that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. 1, 17 (2022). If the conduct is presumptively protected, the government then has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

Most recently, in *United States v. Rahimi*, the Court clarified that its recent Second Amendment cases "were not meant to suggest a law trapped in amber," and that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. 680, 691-92 (2024). The *Rahimi* Court reaffirmed and applied *Bruen*, explaining that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (citing *Bruen*, 597 U.S. at 26-31). This requires the court to ascertain "whether the new law is 'relevantly similar' to laws that

our tradition is understood to permit." *Id.* "[C]entral to this inquiry" is "[w]hy and how the regulation burdens the right." *Id.* (citing *Bruen*, 597 U.S. at 29). Following the guidance from *Rahimi*, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. Further, even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 30).

Applying the *Bruen* test and following principles from *Rahimi*, the Court will now address whether § 922(g)(1) is constitutional on its face and as applied to Gilford. First, the Court will consider whether Gilford's alleged conduct is covered under the plain text of the Second Amendment. If yes, the Court will then evaluate whether the government has met its burden to show that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 689 (quoting *Bruen*, 597 U.S. at 24).

## II.    18 USC § 922(g)(1)

This Court recently upheld the constitutionality of § 922(g)(1) under *New York State Rifle & Pistol Association v. Bruen* in several orders denying motions to dismiss indictments involving both violent and non-violent felons[1]. The Court sees no reasons to deviate from its past decisions. Because felons are not among "the people" protected by the Second Amendment, and the Second

---

[1] *See United States v. Castillo*, 2025 WL 92565 (N.D. Ill. Jan. 14, 2025); *United States v. McKay*, 2024 WL 1767605 (N.D. Ill. Apr. 24, 2024); *United States v. Brown*, 2023 WL 8004290 (N.D. Ill. Nov. 17, 2023); *United States v. Hall*, 2023 WL 8004291 (N.D. Ill. Nov. 17, 2023); *United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023); *United States v. Johnson*, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023); *United States v. Clark*, No. 146 (N.D. Ill. Sept. 7, 2023); *United States v. Dixon*, 2023 WL 2664076 (N.D. Ill. Mar. 28, 2023).

Amendment has historically been understood as protecting law-abiding individuals, Gilford's claims fail.

### A. Facial Challenge

#### 1. Plain Text

The first step of the *Bruen* test requires the Court to examine whether the "plain text" of the Second Amendment covers the possession of firearms by convicted felons. *United States v. Carbajal-Flores*, 143 F.4th 877, 881 (7th Cir. 2025); *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (citing *Bruen,* 597 U.S. at 17). The Second Amendment grants the right to bear arms to "the people." U.S. Const. amend. II. Gilford argues that individuals who have prior felony convictions are part of "the people" protected by the Second Amendment. (Dkt. 19 at 7). While neither the Supreme Court nor the Seventh Circuit have explicitly ruled as such, their precedents suggest otherwise.

First, in support of his argument, Gilford asserts that "'the people' protected by the Second Amendment are the same as those protected by the First and Fourth Amendments." (Dkt. 19 at 7) (citing *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)). In Gilford's view, this understanding of the phrase leads to a conclusion that he, a convicted felon, is covered by the Second Amendment. (*Id*.). Gilford's reliance on *Meza-Rodriguez* is misplaced. The Seventh Circuit acknowledged that *Meza-Rodriguez* was decided without the benefit of *Bruen* and, thus, does not control whether Gilford's § 922(g)(1) conviction is constitutional under the new framework. *Atkinson*, 70 F.4th at 1023. Then-Judge Barrett's dissent in *Kanter* is equally unhelpful to Gilford. 919 F.3d at 453. The majority in *Kanter* recognized the Supreme Court's holdings in *Heller* and *McDonald* that prohibitions on the possession of firearms by felons are presumptively lawful. *Id.* at 441. Further,

5

just like *Meza-Rodriguez*, *Kanter* was decided before *Bruen*, so even if then-Judge Barrett's dissent was persuasive, it does not control here.

Moreover, Gilford's interpretation of the Second Amendment is belied by guidance from *Heller* and *Rahimi*. In his dissent in *Heller*, Justice Stevens explicitly notes that the majority "reads the Second Amendment to protect a 'subset' significantly narrower than the class of persons protected by the First and Fourth Amendments." 554 U.S. at 644. Likewise, in Justice Kavanaugh's concurrence in *Rahimi*, he also draws contrasts between the Second Amendment, which he characterizes as still in its "early innings" with the First, Fourth, and Sixth Amendments. 602 U.S. at 736. These discussions suggest that "the people" may take different meaning depending on the substance of the specific amendment in which it appears. *See United States v. Price*, 2023 WL 1970251, at *4 (N.D. Ill. Feb. 13, 2023) (noting that the differences between the rights protected by the First and Second Amendments serve as an appropriate basis to apply a different rule to the Second Amendment than to the First or Fourteenth) (internal citations omitted).

Gilford also argues that the Supreme Court's conclusions—that restrictions on possession of firearms by felons are presumptively valid and the Second Amendment only protects "law-abiding, responsible citizens"—are non-binding dicta. (Dkt. 19 at 6); (Dkt. 22 at 1-5). Considering the frequency and adamancy with which these conclusions have been repeated and relied upon, this Court is inclined to give them appropriate deference. For instance, in *Bruen*, the Supreme Court frequently cited *Heller*'s conclusion that the Second Amendment applies only to law-abiding citizens. *See, e.g.*, *Bruen*, 597 U.S. at 8-9 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 26 ("The Second Amendment. . . "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.") (internal citations omitted); *id.* at 31-

32 (explaining that applicants applying for gun licenses fell within "the people" contemplated by the Second Amendment because they were "ordinary, law-abiding, adult citizens"); *id.* at 76 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense"). Further, the Supreme Court has repeatedly re-emphasized the assurance from *Heller* that that "nothing" casts doubt on longstanding prohibitions on the possession of firearms by felons. *See, e.g., McDonald*, 561 U.S. at 786; *Bruen*, 579 U.S. at 81 (Kavanaugh, J., concurring); *Rahimi*, 602 U.S. at 680.

The Seventh Circuit has also recently adopted the Supreme Court's oft-repeated conclusion that regulations on felons possessing firearms are presumptively lawful. *See United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024); *United States v. Seiwert*, 152 F.4th 854, 861 n.1 (7th Cir. 2025). In *Gay*, the defendant challenged his conviction under § 922(g)(1) on appeal, arguing that the Second Amendment permitted persons with felony convictions like himself to possess firearms "notwithstanding statutes such as 18 U.S.C. § 922(g)(1)." 98 F.4th at 846. The Seventh Circuit determined this argument was "hard to square" with the Supreme Court's statement in *Heller* that "longstanding prohibitions on the possession of firearms by felons," are valid. *Id.*[2]

Gilford argues that *Gay* cannot survive the Supreme Court's ruling in *Rahimi*. (Dkt. 19 at 8-10). He maintains that the *Rahimi* decision confirms that the Second Amendment right "belongs to all Americans." (*Id.* at 8) (internal citations omitted). Yet, he overlooks how the *Rahimi* Court explicitly recognized the *Heller* ruling that prohibitions on the possession of firearms by "felons" are "presumptively lawful." 602 U.S. at 682 (citing *Heller*, 554 U.S. at 626, 627 n. 26). Further, the Seventh Circuit has recognized post-*Rahimi* that "[t]he government maintains some latitude to

---

[2] Some Courts in this District have interpreted this language in *Gay* as foreclosing any facial challenge to § 922(g)(1). See, e.g., *United States v. McDowell*, 2026 WL 266142, at *2 (N.D. Ill. Feb. 2, 2026) (Coleman, J); *United States v. Evans*, 2026 WL 92872, at *2 (N.D. Ill. Jan. 13, 2026) (Blakey, J.); *United States v. Fillyaw*, No. 23 CR 650, 2024 WL 3338940, at *1 (N.D. Ill. July 9, 2024).

regulate who may possess firearms." *Carbajal-Flores*, 143 F.4th at 881 (citing *Rahimi*, 602 U.S. at 702). Thus, as this Court and others have held, the analysis in *Gay* is "entirely consistent" with *Rahimi*. *See, e.g.*, *United States v. Castillo*, 2025 WL 92565, at *4 (N.D. Ill. Jan. 14, 2025) (Kendall, C. J.); *United States v. Fondren*, 2024 WL 4132771, at *3 (N.D. Ill. Sept. 10, 2024).

As set forth in the precedents detailed above, law-abiding citizens are covered by the Second Amendment, and laws prohibiting felons from possessing firearms are presumptively valid. While there is no binding precedent on whether the Second Amendment's plain text covers convicted felons' possession of firearms, it is reasonable to conclude from this case law that the Amendment does not include such individuals. What's more, Gilford has not pointed to any precedent where the Supreme Court has indicated that a convicted felons' possession of firearms *is* covered by the Second Amendment. As such, the Supreme Court's continuous reaffirmations, adopted recently by the Seventh Circuit, strongly signal that its "dicta" is not something for lower courts to ignore. Accordingly, the plain text of the Second Amendment does not cover convicted felons.

### B. Historical Tradition

Even assuming the Second Amendment's plain text does cover convicted felons, the Government has still met its burden in showing that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation" and does not violate the Second Amendment. *Bruen*, 597 U.S. at 17. After *Bruen*, the Seventh Circuit clarified that a district court must engage in a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)" to determine if "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is justified." *Atkinson*, 70 F.4th at 1021-22 (quoting *Bruen*, 597 U.S. at 29). The analysis involves comparing how and why a challenged regulation burdens the right to bear arms

to the ways in which, and reasons why, historical precursors did. *Carbajal-Flores*, 143 F.4th at 881. "A modern regulation with relevantly similar historical counterparts will survive scrutiny." *Id.* Here, this means that the Government must present historical analogues to show there is a tradition of limiting the right to keep and bear arms that is aligned with § 922(g)(1).

Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess any firearm or ammunition." The Government analogizes § 922(g)(1) with two types of historical laws: (i) laws that categorically disqualified groups who were untrustworthy adherents to the law from possessing firearms and (ii) laws that authorized capital punishment and estate forfeiture for felonies. (Dkt. 21 at 11-12). Because the Government has met its burden of showing that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation," even if the Second Amendment's plain text did cover felons like Gilford, the statute does not violate the Second Amendment.

First, the Government presents evidence of English and Colonial American laws that disarmed people whom the governments deemed as untrustworthy to adhere to the rule of law. (Dkt. 21 at 12-20). Laws prohibiting certain individuals from possessing firearms have existed since at least late 17th-century England. *Bruen*, 597 U.S. at 42-43 (discussing efforts by Kings Charles II and James II in the 17th century to disarm their political opponents); *Seiwert*, 152 F.4th at 870 (same). The Government points out, for example, how in 1689, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71–73 (1688); (Dkt. 21 at 12). This law was based on a theory that Catholics were disobedient of the sovereign, not that they were necessarily dangerous. *See Range v. Attorney Gen. of the U.S.*, 69 F.4th 96, 121–22 (3d Cir. 2023) (Krause, J.,

9

dissenting) (explaining that disarmament laws were not "based on the notion that every single Catholic was dangerous" but rather "the disarmament of Catholics in 1689 reflects Protestant fears that Catholics could not be trusted to obey the law."); *Kanter*, 919 F.3d at 456-57 (Barrett, J., dissenting). The Government also references an English law from the Stuart monarchy that disarmed "nonconformist" Protestants, noting that this group included pacifist denominations like the Quakers. (Dkt. 21 at 13). Further, in 18th century England, one "arousing suspicion of an intention to commit any act of violence or disturbance of the peace" was often prohibited from possessing a firearm. C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 716 (2009) (internal citations omitted).

The Government also notes that Colonial Americans continued the English tradition of disarming classes of people who could not be trusted to obey the law. (*Id.* at 14-16). For example, in 1775, the legislature of Connecticut passed a law disarming any person convicted of "libel[ing] or defam[ing]" any acts or resolutions of the Continental Congress or the Connecticut General Assembly "made for the defence [sic] or security of the rights and privileges of the same." *Seiwert*, 153 F.4th at 870 (citing Act of Dec. 1775, *reprinted in Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive* 192, 193 (Charles J. Hoadly ed., Hartford, 1890)). The Government also points to laws from Colonial Virginia and Massachusetts that disarmed individuals for disrespecting authority and disobeying the law. (*Id.* at 14-15). Further, as the Government explains, in 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. (Dkt. 21 at 17) (citing *4 Journals of the Continental Congress* 1774-1789, at 205 (1906) (resolution of March 14, 1776)).

10

Next, the Government provides support that, historically, laws went much further than § 922(g)(1) by authorizing capital punishment and estate forfeiture for felons. (Dkt. 21 at 20-23). The Government notes that, in England, before the founding of the United States, the standard penalty for a felony was death. (Dkt. 21 at 20); *see also* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). Similarly, the Government explains, many states in early American history used the death penalty for "all serious crimes." (Dkt. 21 at 21); *see also Bucklew v. Precythe*, 587 U.S. 119, 129 (2019). This also explains why disarmament laws were not even more prevalent. *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). Additionally, the Government points out that, in England and early America, a felon's estate would escheat to the state upon his conviction, and he would be required to forfeit all his goods and chattels—including his arms. (Dkt. 21 at 20-1) (citing Blackstone, *Commentaries on the Laws of England*, at 379-28; Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275-276 (2014)).

The basis of these historical English and American laws disarming groups of people was untrustworthiness, not demonstrated violence. *See United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) (observing that "[n]ot all persons disarmed under historical precedents . . . "were violent or dangerous persons" and yet they were disarmed nonetheless). These discriminatory laws would undoubtedly fail to survive constitutional scrutiny today. *See Carbajal-Flores*, 143 F.4th at 885 (citing *Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting)). Nonetheless, they indicate a "historical throughline" of disarming people based on their propensity to disobey the law. *Id.* Similarly, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute categorically disarms untrustworthy individuals—namely, felons. *See*

11

*Atkinson*, 70 F.4th at 1023. Because this contemporary law imposes a similar restriction for similar reasons as laws promulgated at the founding, it is a permissible regulation. *See Rahimi*, 602 U.S. at 692; *Carbajal-Flores*, 143 F.4th at 877 ("The closer the fit, the more likely the challenged law" is permissible).

Gilford argues that these analogues are not sufficient to meet the Government's burden because there were no historical laws that prohibited felons from permanently possessing firearms. (Dkt. 19 at 10-11); (Dkt. 22 at 5-6). Gilford misunderstands the Government's burden. *Bruen* "requires only that the government identify a well-established and representative historical analogue, not a historical twin." 597 U.S. at 30. As the Supreme Court made clear in *Rahimi*, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791" and that "a challenged regulation [need] not precisely match its historical precursors" to be constitutional. 602 U.S. at 691-92 (cleaned up). Thus, the historic disarmament, capital punishment, and estate forfeiture laws for felons discussed by the Government are "relevantly similar" to § 922(g)(1). *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29).

Gilford also asserts that some of the laws the Government relies on, like those targeting minority groups and British loyalists in Colonial America, were enacted because the government saw those groups as non-citizens or enemies of the state, not because they were untrustworthy. (Dkt. 22 at 6). But this is contradicted by the authoritative historical analyses discussed above. Further, those analyses suggest that the Colonial American government disarmed these groups not merely because of their identities as non-citizens or seditious figures, but because those groups were untrustworthy. Finally, Gilford argues that the Government's historical analysis only shows that the government at the time of the founding had the power to disarm felons, not the will. (*Id.*).

12

Yet, Gilford presents no historical evidence to support this, nor does he persuasively explain how such a distinction could impact this Court's analysis under *Bruen*.

While the English and colonial laws discussed above may not perfectly align with § 922(g)(1), they are sufficiently analogous with § 922(g)(1) to show the statute is consistent with the nation's history and tradition. Accordingly, the Government has met its burden under *Bruen* to demonstrate that § 922(g)(1) is "consistent with the principles underpinning [the country's] regulatory tradition." *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29). As such, Gilford's facial challenge to § 922(g)(1) fails.

## III. As-Applied Challenge

Gilford also argues that § 922(g)(1) is unconstitutional as applied to him. (Dkt. 19 at 13-16). Neither the Supreme Court nor the Seventh Circuit have explicitly authorized as-applied challenges to § 922(g)(1), but the Seventh Circuit has assumed for argument's sake that "there is some room" for such challenges. *See Gay*, 98 F.4th at 846; *Carbajal-Flores*, 143 F.4th at 889 (recognizing that "some courts have left open the possibility of allowing non-violent felons to challenge the constitutionality of that provision as applied to them").

If a defendant calls for a distinction between violent and non-violent crimes under § 922(g)(1) or some other type of individualized assessment, he must present historical evidence supporting a different outcome. *See Atkinson*, 70 F.4th at 1024. Gilford argues that the historic laws discussed by the Government disarming Catholics, Native Americans, and the enslaved contained carveouts allowing individuals to possess or regain possession of firearms under certain circumstances. (*Id.* at 14-15). This, he contends, suggests that individualized exceptions to general prohibitions on firearm possession were historically allowed. (*Id.*). Not so. These examples indicate, at most, that there were categorical exceptions to historical disarmament laws based on

13

particular sets of circumstances, not individualized exceptions based on a person's specific criminal history. As such, Gilford has not presented sufficient historical evidence to support the type of individualized assessment he asks for. *See Jackson*, 110 F.4th at 1125 ("[W]e conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"); *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image").

Further, there is no historical evidence supporting a distinction in the application of § 922(g)(1) between violent and non-violent felons. Gilford argues that colonial era disarmament laws were based on a "specific nexus to forceful, violent conduct in rebellion of the government," not "by a risk of illegal activity in general." (Dkt. 19 at 14). This history, Gilford contends, supports an exception to § 922(g)(1) for non-violent felons. (*Id.* at 15). To the contrary, the historical evidence points to an opposite conclusion—laws in American colonies and 17th-century England suggest that felons, both violent and non-violent, were targeted for firearm dispossession. *See* discussion *supra* Part II.A.2. While the Seventh Circuit has yet to definitively rule on this issue, courts in this Circuit and others have similarly rejected the notion that convicted felons whose predicate offenses were "non-violent" remain constitutionally exempt from § 922(g)(1)'s blanket ban on felons possessing firearms.[3]

---

[3] *See United States v. Hardy*, 2023 WL 6795591, at *6 (N.D. Ill. Oct. 13, 2023) (Kendall, C.J.); *Atkinson v. Bondi et al.* 2026 WL 323280, at *6 (N.D. Ill. Feb. 6, 2026) (Blakey, J.); *United States v. Gutierrez*, 2024 WL 4041321, at *12 (N.D. Ill. Sept. 4, 2024) (Chang, J.); *United States v. Hunt*, 123 F.4th 697, 700, 705-06 (4th Cir. 2024) (identifying historical tradition of regulating gun possession by non-violent criminal offenders and holding that a person convicted of any felony "cannot make a successful as-applied challenge to § 922(g)(1) unless the felony is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful"); *United States v. Peck*, 131 F.4th 629, 632 (8th Cir. 2025) (rejecting as-applied challenge to § 922(g)(1) where defendant had prior conviction for nonviolent drug offense); *United States v. Warner*, 131 F.4th 1137, 1148-19 (10th Cir. 2025) (holding that § 922(g)(1) remains "constitutional as applied to non-violent felons"); *Zherka v. Bondi*, 140 F.4th 68, 91-93 (2d Cir. 2025) (§ 922(g)(1) is not unconstitutional as applied to non-violent felons); *United States v. Duarte*, 137 F.4th 743, 750, 762 (9th Cir. 2025) (same).

Even assuming there was historical evidence to distinguish between violent and nonviolent felons, Gilford's past crimes would be sufficient to find § 922(g)(1) constitutional as applied to him. Courts consider the nature of a defendant's criminal history when determining if they are the type of individual that the statute constitutionally prevents from possessing a firearm. *Gay*, F.4th at 846-47. In *Gay,* the Seventh Circuit considered the defendant's 22 previous convictions, including aggravated battery of a police office and possessing a weapon while in prison, and his attempt to flee from the police before his arrest. *Id.* at 847. The Court concluded that, based on this, the defendant was not a "law-abiding, responsible person who has a constitutional right to possess firearms." *Id.* (internal citations omitted).

Gilford argues that this Court should not follow *Gay* because its holding was rejected by the Supreme Court in *Rahimi*. (Dkt. 19 at 7-9). In his view, *Rahimi* abrogates *Gay*'s "rule" that only law-abiding or responsible citizens are entitled to Second Amendment right because the *Rahimi* Court found "responsibility," standing alone, too vague a criterion to deny firearm possession. 602 U.S. at 700. First, contrary to Gilford's reading of *Gay*, the Seventh Circuit did not promulgate any rules for deciding as-applied challenges to § 922(g)(1). It merely used the Supreme Court's phrase "law-abiding, responsible citizens" as a guidepost for analyzing the defendant and the facts of his case, as is required when faced with an as-applied challenge to a statute. *Gay*, 98 F.4th at 846-47; *see also Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 686 (N.D. Ill. 2021) (an as-applied challenge considers "the specific facts of [the] case"). Second, the Seventh Circuit's use of the phrase does not run afoul of *Rahimi* because "responsibility" does not stand alone in the Court's analysis. *United States v. Baxter*, 2024 WL 4679096, at *3 (N.D. Ill. Nov. 5, 2024).

15

Furthermore, there is no daylight between the *Rahimi* and *Gay* holdings that would require this Court to apply the former but not the latter, as Gilford requests. The Court in *Rahimi* held that "an individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." 602 U.S. at 702. The Court went on to conclude that § 922(g)(1) could be lawfully applied to the defendant. *Id.* at 700. In doing so, the Court inherently had to consider whether the defendant was a credible threat to the physical safety of another. *Id.* at 700-702. Likewise in *Gay*, the Seventh Circuit considered the characteristics of the defendant in determining that § 922(g)(1) could be constitutionally applied to him. 98 F.4th at 846-47. Thus, the Seventh Circuit's analysis and holdings in *Gay* and the Supreme Court's analysis and holdings in *Rahimi* are aligned.

With guidance from these precedents in mind, the Court finds that § 922(g)(1) is constitutional as applied to Gilford. Gilford has multiple felony convictions for aggravated unlawful use of a firearm, manufacturing/delivering fentanyl, and escape from electronic monitoring while on probation. (Dkt. 19 at 1-2); (Dkt. 21 at 3). Gilford's criminal history clearly indicates a propensity to disobey the law. Gilford points to several out-of-Circuit cases where defendants with similar criminal histories succeeded in their as-applied challenges to § 922(g)(1). (Dkt. 19 at 16). Yet this Court and others in this Circuit have reached the opposite conclusions. *See, e.g., United States v. Hardy*, 2023 WL 6795591, at *6 (N.D. Ill. Oct. 13, 2023) (Kendall, C.J.) (rejecting as-applied challenge to § 922(g)(1) where defendant had previous drug-related felony convictions); *United States v. Hall*, 2023 WL 8004291, at *6 (N.D. Ill. Nov. 17, 2023) (Kendall, C.J.) (same); *United States v. McDowell*, 2026 WL 266142, at *3 (N.D. Ill. Feb. 2, 2026) (same where defendant had multiple prior non-violent felony convictions, including aggravated unlawful use of a weapon); "); *United States v. Evans*, 2026 WL 92872, at *5 (N.D. Ill. Jan. 13, 2026)

(defendant's criminal history that included arrests for aggravated unlawful use of weapons and probation violations underscored his "disrespect for legal norms of society") (internal citations omitted).

Moreover, even if there was a carveout for non-violent felons, there is evidence, as the Government highlights, that the historical understanding of "dangerousness" included even potentially violent individuals, such as Gilford. (Dkt. 21 at 31-32). *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (explaining that to prevent "dangerous" people from possessing guns, "founding-era legislatures categorically disarmed groups whom they judged to be a *threat* to public safety.") (emphasis added); *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (describing drug crimes as "associated with dangerous and violent behavior"). Accordingly, even if Gilford presented sufficient evidence to support the notion that § 922(g)(1) constitutionality turns on individualized assessments or requires convictions for violent felonies, he is the sort of individual whom the statute constitutionally prevents from possessing a firearm.

Finally, Gilford argues, without support, that his previous convictions are not current enough to deny him the right to bear arms. (Dkt. 19 at 16). The Court does not find that Gilford's convictions from 2021 and 2023 are too dated to be relevant to his as-applied challenge. *See, e.g. McDowell*, 2026 WL 266142 at *3 (rejecting as-applied challenge where defendant had multiple felony convictions that were more than 10 years old); *United States v. Donald*, 732 F. Supp. 3d 937, 942 (N.D. Ill. 2024) (same where defendant had two non-violent felonies, both over seven years old). Accordingly, § 922(g)(1) as applied to Gilford does not violate the Second Amendment.

17

**CONCLUSION**

For these reasons, Gilford's Motion to Dismiss [19] is denied.


_____
Virginia M. Kendall
United States District Judge

Date: March 6, 2026

18